UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.

CONSERVATION ALLIANCE OF ST. LUCIE
COUNTY, a Florida Not-For-Profit Corporation;
and TREASURE COAST ENVIRONMENTAL
DEFENSE FUND a/k/a INDIAN RIVERKEEPER,

      Plaintiffs,

vs.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, ANTHONY FOXX, in his
official capacity as Secretary of the Department of
Transportation; FEDERAL HIGHWAY
ADMINISTRATION, VICTOR M. MENDEZ,
Administrator of the Federal Highway
Administration; and JAMES CHRISTIAN, Division
Administrator of the Florida Division of the Federal
Highway Administration.

      Defendants.

_____/

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     This action challenges the Federal Highway Administration's ("FHWA") decision to approve the construction of a six-lane bridge across the North Fork St. Lucie River Aquatic Preserve ("Aquatic Preserve") and Savannas Preserve State Park ("Savannas Preserve" and collectively, the "Preserves") (the "Proposed Project"). The Proposed Project would use approximately fifteen acres of public park and conservation land, would directly impact approximately eleven acres of wetlands and 3.95 acres of upland forested habitat, and would require relocation of the popular Halpatiokee Canoe and Nature Trail--the only public access point to the Aquatic Preserve from the Savannas Preserve in the project area.

2.     Together the Preserves are an important state and regional natural resource that provides a much-needed escape for local residents and visitors from the surrounding urban environment. Common uses of the area include paddling, bird watching, boating, fishing, and crabbing. In addition, the Preserves constitute a unique ecosystem that includes high quality wetland marsh and upland forested habitats, as well as an extraordinary variety of temperate and subtropical species. The project area also includes three types of essential fish habitat, and includes an area listed by the Florida Fish and Wildlife Commission as a "Biodiversity Hotspot" that contains "Priority Wetlands." The project area includes one of only two locations in the region designated as a "Locally Significant Natural Area" by the Florida Natural Areas Index.

3.     The FHWA has determined that the Savannas Preserve and the Aquatic Preserve are Section 4(f) resources protected by the Department of Transportation Act ("Transportation Act"). The Defendants violated the Transportation Act and the Administrative Procedures Act, 5 U.S.C. §§ 701-706 ("APA"), when they considered and then approved the Proposed Project after (1) arbitrarily and capriciously eliminating feasible and prudent alternatives which avoid impacts to public preservation land, and (2) failing to conduct all possible planning to minimize harm from the Proposed Project to the Preserves.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal law. All administrative remedies have been exhausted. The challenged agency action is final and subject to this Court's review.

5.     Venue is proper in this district under 28 U.S.C. § 1391(e)(2) because a substantial part of the events or omissions giving rise to this case occurred in St. Lucie County, Florida, located in the federal judicial Southern District of Florida.

## PARTIES

6.     Conservation Alliance of St. Lucie County (hereinafter "Alliance") is a not-for-profit corporation in good standing, with its principal office currently located at 3070 SE Galt Circle, Port St. Lucie, FL 34984. Alliance has approximately 200 members, and has been

incorporated since 1985. Alliance's mission is to protect the water, soil, air, native flora and fauna upon which all the Earth's creatures depend on for survival.

7.      Many of Alliance's members regularly go to the Halpatiokee Trail within the Savannas Preserve in order to hike, sightsee, and take pictures. Alliance maintains a blog on its website exclusively showing pictures of the scenery and plant life at the Halpatiokee Trail, with descriptions of each plant shown. Alliance's members canoe or kayak into the Aquatic Preserve fro the Halpatiokee Trail. The Proposed Project would construct a bridge directly through the current location of the Halpatiokee Trail, impairing the Preserves' unique scenic, recreational, and wildlife attributes. If the Proposed Project is allowed to proceed in violation of federal law, the members of Alliance that regularly use this area will experience a concrete and legally cognizant injury.

8.      The Treasure Coast Environmental Defense Fund, Inc., known also as the Indian Riverkeeper (hereinafter "Riverkeeper"), is a not-for-profit corporation in good standing, with its principal office located at 809 S. Indian River Drive, Ft. Pierce, Florida 34950. Riverkeeper prides itself as being an independent voice on behalf of the Indian River Lagoon, which includes within its boundaries the Aquatic Preserve. Riverkeeper's mission is to protect and restore the waters of North America's most diverse estuary, the Indian River Lagoon, its tributaries, fisheries and habitats. Riverkeeper has approximately 150 members, many of whom reside in St. Lucie County, Florida. Many of Riverkeeper's members regularly use the Indian River Lagoon, including the Aquatic Preserve and the Halpatiokee Trail in the Savannas Preserve, for recreational purposes such as fishing, boating and sightseeing. The Proposed Project would result in concrete and legally cognizant injury to Riverkeeper and its members that regularly frequent the Savannas Preserve and the AP. As previously stated, the Proposed Project would involve the construction of a bridge directly through the current location of the Halpatiokee Trail, the only public access point to the Aquatic Preserve from the Savannas Preserve in the project area.

9.     Defendant United States Department of Transportation ("USDOT") is an executive department of the United States government. Its duties include ensuring the effective implementation of the transportation programs of the federal government, and encouraging cooperation of federal, state and local governments to achieve transportation objectives. 49 U.S.C. § 101(b). USDOT will be providing funding for the Proposed Project.

10.    Defendant Anthony Foxx is the Secretary of the USDOT.  Secretary Foxx oversees the activities of the USDOT and its agencies, including the FHWA, and is responsible for ensuring that all federally funded transportation projects comply with applicable laws. Secretary Foxx is sued in his official capacity.

11.    Defendant FHWA is a federal agency within the USDOT. The FHWA oversees the preparation of Environmental Impact Statements ("EIS") for the FHWA and USDOT, and reviews such statements to determine their compliance with the National Environmental Policy Act ("NEPA"), the Transportation Act, and other federal laws. The FHWA is also responsible for approving or denying EISs in the form of written Records of Decision ("ROD"). The FHWA was the agency responsible for preparation of the Final EIS ("FEIS") that is associated with the Proposed Project. The FHWA, through its Florida Division, issued a ROD on February 24, 2014, approving the Proposed Project and the associated FEIS.

12.    Defendant Victor M. Mendez is the FHWA Administrator, and oversees the activities of FHWA and its various divisions.  Administrator Mendez is sued in his official capacity.

13.    Defendant James Christian is the Florida Division Administrator for the FHWA. Administrator Christian oversees the activities of the Florida Division, including the preparation and approval of EISs and the issuance of RODs.  Administrator Christian oversaw the preparation of the FEIS associated with the Proposed Project and individually approved the February 24, 2014, ROD. Administrator Christian is sued in his official capacity.

## LEGAL FRAMEWORK

### Section 4(f) of the Transportation Act
### (23 U.S.C. § 138; 49 U.S.C. § 303[1])

14.     Congress has directed that "the protection of parkland is to be given paramount importance." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 412 (1971) ("*Overton Park*"). To that end, Section 4(f) of the Transportation Act prohibits the Secretary of the USDOT (hereinafter "Secretary") from funding or approving any project requiring the use of a publicly-owned park, recreation area, or wildlife and waterfowl refuge "unless (1) there is no feasible and prudent alternative to use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, [and] wildlife and waterfowl refuge...." 49 U.S.C § 303(c). "[O]nly the most unusual situations are exempted." *Overton Park* at 411.

15.     An alternative that avoids use of 4(f) resources ("Avoidance Alternative") is "feasible and prudent" if it does not cause other *severe* problems of a magnitude that *substantially outweighs* the importance of protecting public park and conservation lands.     23 C.F.R § 774.17 (2014) (emphasis added).   An avoidance alternative becomes the preferred alternative unless it is shown to be infeasible or imprudent.

16.     An avoidance alternative is "feasible" if it can be built according to sound engineering judgment. 23 C.F.R § 774.17 (2013).

17.     An avoidance alternative is not "prudent" if:

(i) It compromises the project to a degree that it is unreasonable to proceed with the project in light of its stated purpose and need;
(ii) It results in unacceptable safety or operational problems;
(iii) After reasonable mitigation, it still causes:
     (A) *Severe* social, economic, or environmental impacts;
     (B) *Severe* disruption to established communities;
     (C) *Severe* disproportionate impacts to minority or low income populations; or
     (D) *Severe* impacts to environmental resources protected under other Federal

---

[1] The Federal-Aid Highway Act of 1968 amended the 4(f) wording in sections 23 U.S.C. § 138 and 49 U.S.C. § 303 to be consistent with each other.

statutes;

(iv) It results in additional construction, maintenance, or operational costs of an *extraordinary* magnitude;

(v) It causes other unique problems or unusual factors; or

(vi) It involves multiple factors in paragraphs (3)(i) through (3)(v) of this definition, that while individually minor, cumulatively cause unique problems or impacts of *extraordinary* magnitude. *Id.* (emphasis added)

18.    As the Supreme Court paraphrased the project, the Secretary may not approve a transportation project that uses a Section 4(f) resource "unless there are truly unusual factors present...or the cost or community disruption resulting from [an] alternative route reache[s] extraordinary magnitudes." *Overton Park* at 413.

19.    If there is no feasible and prudent avoidance alternative to use of a Section 4(f) resource, then the Secretary may approve, from among the remaining alternatives that use Section 4(f) property, *only* the alternative that "[c]auses the least overall harm in light of the statute's preservation purpose." 23 CFR 774.3(c)(1).

20.    The least overall harm is determined by balancing the following factors:

(i) The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property);

(ii) The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection;

(iii) The relative significance of each Section 4(f) property;

(iv) The views of the official(s) with jurisdiction over each Section 4(f) property;

(v) The degree to which each alternative meets the purpose and need for the project;

(vi) After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and

(vii) Substantial differences in costs among the alternatives. 23 CFR § 774.3(c)(2)

21.    The clear directive of the Transportation Act is that Section 4(f) resources generally must receive greater protection than non-Section 4(f) resources.

22.    Once the Secretary selects the least overall harm alternative, he must ensure that alternative includes all possible planning to minimize harm to Section 4(f) property. 23 CFR §

774.3(c)(2).  All possible planning means that *all* reasonable measures to minimize harm or mitigate for adverse impacts and effects must be included in the project.  23 CFR § 774.17.

## Administrative Procedure Act
### (5 U.S.C. § 706)

23.     The APA authorizes judicial review of a final agency action such as the February 24, 2014, ROD and incorporated FEIS approved by the FHWA.  Under the APA, a court must set aside an agency action if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, or if it was made without observance of procedure required by law. 5 U.S.C. § 706(2)(A) and (D).

24.     Under the arbitrary and capricious standard of review, a court will uphold the agency's action only if the agency considered relevant factors and can articulate a rational connection between the facts in the record and the ultimate decision rendered.  *RTC Transp., Inc. v. I.C.C.*, 708 F.2d 620, 622 (11th Cir. 1983).  When evaluating compliance with Section 4(f), this requires the reviewing court to "engage in a substantial inquiry." *Overton Park* at 415.

## FACTUAL BACKGROUND

### The Resources at Stake

25.     The Savannas Preserve and the Aquatic Preserve are Section 4(f) resources protected by the Transportation Act.

**North Fork St. Lucie River Aquatic Preserve**

26.     The Aquatic Preserve spans 2,972 acres of surface water area along 16 river miles of the North Fork St. Lucie River (NFSLR).  It was designated in 1972 "because of a significant level of scientific, aesthetic, and biological value to the public."

27.     The Aquatic Preserve supports a unique combination of temperate and subtropical species, and only one other such ecosystem exists in the region.

28.     The Aquatic Preserve is designated as a Sovereign Submerged Land and as an Outstanding Florida Water.  It supports eight Essential Fish Habitats managed by the South Atlantic Fisheries Management Council.

29.     According to the Florida Department of Environmental Protection ("FDEP"), the primary purpose of the Aquatic Preserve "is to maintain and enhance the existing wilderness condition for the enjoyment of future generations and for the propagation of fish and wildlife and public recreation."  The FDEP has also stated that the Aquatic Preserve "and its natural communities provide a unique wilderness experience...for local citizens and visitors."

30.     Common uses of the Aquatic Preserve include paddling, bird watching, boating, fishing and crabbing.

**Savannas Preserve State Park**

31.     The Savannas Preserve is considered an important regional park for recreational activities such as boating, fishing, hiking, and nature study.  Further, it is considered a significant component of the overall state park system.

32.     Like the Aquatic Preserve, the Savannas Preserve is managed with the primary purpose of conserving the ecosystem for public outdoor recreation and for the propagation of fish and wildlife.

33.     The Savannas Preserve serves the important function of buffering the Aquatic Preserve from the water quality impacts presented by the surrounding urbanized environment.

34.     The Savannas Preserve includes state imperiled habitats, including small areas of scrub and extensive tidal swamp.

**Project Planning and 4(f) Analysis**

35.     On November 14, 2013, the FEIS was completed for the Proposed Project.

36.     Defendants assert that the purpose and need for the Proposed Project is to alleviate substantial traffic capacity deficiencies across the Port St. Lucie Boulevard and Prima Vista Boulevard bridges (hereinafter "Existing Bridges") in Port St. Lucie, St. Lucie County, Florida in order to accommodate future growth.

**Alternatives Considered**

37.     The FEIS analyzes six alternative routes for a future six-lane bridge in Port St. Lucie that will extend from the Crosstown Parkway on the western side of the Aquatic Preserve to US-1 on the eastern side of the Aquatic Preserve. These alternative routes are called: 1C, 6A, 2A, 2D, 1F, and 6B (hereinafter "Build Alternatives"). All build alternatives incorporate the traditional pile bent construction method.

38.     In addition to the Build Alternatives, Defendants considered a number of other alternatives, including:

    a.     Locating a new bridge in a different corridor, avoiding use of the Aquatic Preserve but not the Savannas Preserve (hereinafter "Corridor 2 Alternative").

    b.     Incorporating a bus transportation system and bicycle lanes that cross the existing bridges, alleviating the current complete lack of east-west public transportation in Port St. Lucie (hereinafter "Multimodal Alternative"). The Multimodal Alternative would avoid use of both the Preserves (called an "avoidance alternative").

    c.     Implementing transportation system management ("TSM") to increase efficiency, operation, and capacity of roadways (hereinafter "TSM Alternative"). The TSM Alternative assumes implementation of the following operational technologies: optimization of system-wide signal timing and phasing; additional turn lanes; an additional northbound to westbound left-turn lane; and an additional southbound right-turn overlap phase. The TSM alternative is an avoidance alternative.

    d.     Widening existing bridges combined with the TSM Alternative and the Multimodal Alternatives (hereinafter "Bridge Widening Alternative"). This alternative would use land within both of the Preserves, but would avoid construction of a new bridge crossing.

**Impacts of Selected Alternative**

39.     Defendants selected Build Alternative 1C as the preferred alternative (hereinafter, the "Selected Alternative").

40.     Impacts of the Selected Alternative include:

a.     Use of approximately 15 acres of land with in the Preserves--more than any of the five other Build Alternatives.

b.     Direct impacts to 10.10 acres of wetlands-- the greatest among the Build Alternatives.

c.     Introduction of invasive plant species in the natural habitats adjacent to the newly constructed bridge.

d.     Shading that will affect the survival of plant communities in the forested and marsh habitats of the Preserves to a degree that the functioning of these habitats could be substantially reduced.  The Selected Alternative's shading effects are greater than any other Build Alternative.

e.     High potential for harmful impact to species listed as endangered or threatened pursuant to the Endangered Species Act ("Listed Species").

f.     Displacement of one hundred households, including low income, elderly, and minority households.

g.     Altered traffic patterns and significant visual and noise impacts in established residential neighborhoods.

**Existence of Multiple Feasible and Prudent Avoidance Alternatives**

41.     Defendants assert that no feasible and prudent avoidance alternative to the Selected Alternative exists.  This is the inaccurate conclusion of a very carefully constructed analysis designed to reach that determination in order to avoid having to select an avoidance alternative that is not preferred by the decision-makers.  With very minor design changes, two very slightly altered variations on Alternative 6A would be avoidance alternatives.  The Multimodal Alternative and TSM Alternative are also avoidance alternatives.

*Spliced Beam 6A Alternative*

42.     Alternative 6A, if constructed using the pretested post tensioned (spliced) beam bridging option (hereinafter "Spliced Beam 6A Alternative"), is a feasible alternative which avoids all use of the Savannas Preserve and the AP.

43.     The Spliced Beam 6A Alternative is a prudent alternative to the Selected Alternative.

44.     As compared to the Selected Alternative, the Spliced Beam 6A Alternative does not result in any unacceptable safety or operational problems.

45.     As compared to the Selected Alternative, the Spliced Beam 6A Alternative does not, after reasonable mitigation, cause severe social, economic or environmental impacts.

46.     Spliced Beam Alternative 6A impacts fewer acres of wetlands and upland forested areas than any of the other Build Alternatives (other than perhaps other variations of Alternative 6A), and has a lower chance of causing negative impact to Listed Species than does the Selected Alternative. The Spliced Beam 6A Alternative would use a total of 7.74 acres of non-4(f) wetlands compared to the Selected Alternative's 10.10 acres.

47.     All Build Alternatives, including the Selected Alternative, would pave over part of an established residential neighborhood in order to cross the Aquatic Preserve. As compared to the Selected Alternative, the Spliced Beam 6A Alternative does not, after reasonable mitigation, cause severe disruption to established communities.

48.     As compared to the Selected Alternative, the Spliced Beam 6A Alternative does not, after reasonable mitigation, cause severe disproportionate impacts to minority or low income populations.

49.     As compared to the Selected Alternative, the Spliced Beam 6A Alternative does not, after reasonable mitigation, cause severe impacts to environmental resources protected under other Federal statutes;

50.     As compared to the Selected Alternative, the Spliced Beam 6A Alternative does not result in additional construction, maintenance, or operational costs of an extraordinary magnitude.

51.     As compared to the Selected Alternative, the Spliced Beam 6A Alternative does not cause other unique problems or unusual factors.

***Aquatic Preserve Avoidance 6A Alternative***

52.     Alternative 6A can be constructed using the pile bent construction as proposed in the FEIS, but avoiding use of the Aquatic Preserve (hereinafter "Aquatic Preserve Avoidance 6A Alternative"). The Aquatic Preserve Avoidance 6A Alternative is a feasible alternative which avoids all use of the Preserves by using only an additional 0.0015 acres of non-4(f) land.

53.     The Aquatic Preserve Avoidance 6A Alternative is a prudent alternative to the Selected Alternative.

54.     As compared to the Selected Alternative, the Aquatic Preserve Avoidance 6A Alternative does not result in any unacceptable safety or operational problems.

55.     As compared to the Selected Alternative, the Aquatic Preserve Avoidance 6A Alternative does not, after reasonable mitigation, cause severe social, economic or environmental impacts.

56.     As compared to the Selected Alternative, the Aquatic Preserve Avoidance 6A Alternative does not, after reasonable mitigation, cause severe disruption to established communities.

57.     As compared to the Selected Alternative, the Aquatic Preserve Avoidance 6A Alternative does not, after reasonable mitigation cause severe disproportionate impacts to minority or low income populations.

58.     As compared to the Selected Alternative, the Aquatic Preserve Avoidance 6A Alternative does not, after reasonable mitigation, cause severe impacts to environmental resources protected under other Federal statutes;

59.    As compared to the Selected Alternative, the Aquatic Preserve Avoidance 6A Alternative does not result in additional construction, maintenance, or operational costs of an extraordinary magnitude.

60.    As compared to the Selected Alternative, the Aquatic Preserve Avoidance 6A Alternative does not cause other unique problems or unusual factors.

**Multimodal Alternative and TSM Alternative**

61.    The Multimodal Alternative is a feasible alternative which avoids all use of the Preserves.

62.    The Multimodal Alternative is a prudent alternative to the Selected Alternative.

63.    The administrative record does not support Defendants' conclusion that the Multimodal Alternative and TSM Alternative fail to meet the Proposed Project's purpose and need.

**Arbitrarily Restricted Pool of Remaining Alternatives**

64.    Defendants failed to consider all non-avoidance alternatives in their least harm analysis, including Alternative 6A, the Corridor 2 Alternative, and the Bridge Widening Alternative. Each of these alternatives causes less harm in light of 4(f)'s preservation purpose than the Selected Alternative.

65.    In light of Section 4(f)'s purpose of preserving public park and conservation lands, Alternative 6A causes less harm than the Selected Alternative. Alternative 6A uses a miniscule 0.01 acres of 4(f) property compared to the Selected Alternative's use of 2.23 acres of 4(f) property. Alternative 6A avoids the Selected Alternative's impacts to the Halpatiokee Canoe and Nature Trail in the Savannas Preserve. Alternative 6A uses many fewer acres of wetlands than the Selected Alternative. While all build alternatives pave over an established residential neighborhood, Alternative 6A would result in the relocations of only 18 more single family homes than the Selected Alternative. Alternative 6A does not cause significantly more visual and noise impacts than the Selected Alternative. Although Alternative 6A "would substantially change traffic flows within a retirement community," there are no facts in the

record showing that relocating the entrance will change traffic patterns in any negative sense. Likewise, the administrative record fails to establish that impacts to minority households are significantly more severe in Alternative 6A than in the Selected Alternative.

66.     The Corridor 2 alternative was rejected for failing to meet the project purpose and need of the project. In support, Defendants claim that, by 2025, a future Corridor 2 bridge would reach full capacity and the existing bridge crossing at Prima Vista Blvd. would be 24% above capacity. Despite these findings, Corridor 2 has the greatest effect on reducing traffic from the Port St. Lucie Bridge of any alternative considered. The Port St. Lucie Boulevard Bridge would operate substantially below capacity in 2025. Moreover, the Defendants acknowledge that the Port St. Lucie Boulevard Bridge serves a higher traffic demand than the Prima Vista Boulevard Bridge, and is considered the most logical future east-west route to destinations along US-1. Defendants failed to balance all of the factors required in the least harm analysis.

67.     Defendants also rejected the Bridge Widening Alternative for failure to meet the project purpose and need.[2] This conclusion is not supported by the facts. Under the Bridge Widening Alternative, the existing bridges are projected to be within capacity in 2037, except that the Port St. Lucie Boulevard Bridge would be 21 percent over capacity for the evening peak hour. The conclusion that this alternative does not meet the project purpose and need rests solely on this evening peak hour capacity deficiency. This conclusion is undermined by the fact that even the preferred alternative is projected to result in a 16 percent evening peak hour capacity deficiency for 2037. A 5 percent difference is insufficient to render the Bridge Widening Alternative unable to meet the project purpose and need.

---

[2] To meet the project purpose and need, at a minimum, a project must improve system performance on the two existing bridge crossings, maintain or improve existing intersection efficiency, and provide additional traffic capacity to meet projected growth and demand.

## COUNT 1

**(Violations of the Transportation Act and the APA: Failure to Select Available Avoidance Alternative)**

68.     Under the Transportation Act, the Secretary of the USDOT is prohibited from approving a transportation project that uses a publicly owned park, recreation area or wildlife and waterfowl refuge if there is a feasible and prudent alternative.  49 U.S.C. § 303(c); 23 U.S.C. § 138.

69.     Defendants violated the Transportation Act by choosing the Selected Alternative instead of a feasible and prudent alternative which would avoid all use of 4(f) resources.

70.     Defendants' failure to select an available feasible and prudent avoidance alternative constitutes arbitrary and capricious agency action, is an abuse of discretion, and is contrary to law and to procedures required by law.  5 U.S.C. § 706(2)(A).

## COUNT 2

**(Violations of the Transportation Act and the APA: Failure to Minimize Impact to 4(f) Resources)**

71.     Under the Transportation Act, if there are no feasible and prudent alternatives to use of a Section 4(f) resource, the Secretary is required to conduct all possible planning to minimize harm to Section 4(f) resources that are used, including selecting only the alternative that causes the least harm overall.  49 U.S.C § 303(c); 23 U.S.C. § 138; 23 C.F.R. § 774.3(c); 23 C.F.R. § 774.17.

72.     Defendants failed to conduct "all possible planning" when they:

   a.     Placed improper weight on just one of the seven least harm factors when rejecting alternative 6A—impact to resources not protected by Section 4(f)—and then concluded, without sufficient factual support, that alternative 6A causes the "most harm to non-Section 4(f) resources."

   b.     Improperly analyzed the Corridor 2 Alternative and Bridge Widening Alternative as avoidance alternatives instead of under the least overall harm standard.

73.     Defendants' failure to conduct all possible planning to minimize harm from the Proposed Project to the Preserves constitutes arbitrary and capricious agency action, is an abuse of discretion, and is contrary to law and to procedures required by law.  5 U.S.C. § 706(2)(A) and (D).

### Prayer for Relief

74.     The Common Allegations are incorporate herein by reference.

WHEREFORE, Plaintiffs request that the Court:

a.     Declare Defendants' failure to select an available avoidance alternative to the Proposed Project in the Preserves in violation of the Transportation Act, and the APA;

b.     Declare Defendants' failure to conduct all possible planning to minimize harm to Section 4(f) resources that are used as part of the Selected Alternative in violation of the Transportation Act, and the APA;

c.     Enjoin the Defendants to comply with the applicable provisions of the Transportation Act;

d.     Vacate the February 24, 2014 Record of Decision (ROD) approving the Proposed Project and the incorporated FEIS;

e.     Enjoin Defendants from proceeding with any irrevocable actions related to the construction of the Proposed Project;

f.     Award plaintiffs their costs and reasonable attorneys' fee and expert fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 and Fed. R. Civ. P. 54(d); and

g.     Award plaintiffs any other relief that is just and proper.

DATED: May 12, 2014

Respectfully submitted,

Robert N. Hartsell, Esq.
Florida Bar No. 636207
Sarah M. Hayter, Esq.
Florida Bar No. 83823
ROBERT N. HARTSELL, P.A.
Federal Tower Building
1600 S. Federal Hwy., Ste 921
Pompano Beach, Florida 33062
Telephone (954) 778-1052
Facsimile (954) 941-6462
Robert@Hartsell-Law.com
Sarah@Hartsell-Law.com

_____/S/_____
Rachel S. Doughty, *pro hac vice pending*
Attorney at Law
1202 Oregon Street
Berkeley, CA 94702
(828) 424-2005
rdoughty@greenfirelaw.com

Attorneys for Plaintiffs